UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

RAYMOND SMITH,

                    Petitioner,                Case No. 1:05–cv-248

v.                                     Honorable Richard Alan Enslen

KENNETH McKEE,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of life imprisonment without the possibility of parole, imposed by the Kent County Circuit Court on February 5, 2001, after a jury convicted Petitioner of first-degree felony murder, MICH. COMP. LAWS § 750.316(1)(b). In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

    I.      WERE [PETITIONER'S] STATEMENTS INVOLUNTARILY MADE DUE TO THE SEVERE MISTREATMENT THAT HE SUSTAINED BY OFFICERS DURING HIS INCARCERATION IN LOUISIANA.

    II.     WAS [PETITIONER] DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE TRIAL COURT RULED, OVER OBJECTION, THAT OTHER ACTS EVIDENCE WAS ADMISSIBLE UNDER MRE 404(b), AND WAS DEFENSE COUNSEL INEFFECTIVE IN SUBSEQUENTLY SIGNING A STIPULATION REGARDING THE PRIOR BAD ACTS EVIDENCE.

    III.    MUST [PETITIONER'S] FELONY MURDER CONVICTION BE REVERSED BECAUSE THE PROSECUTION FAILED TO PRODUCE SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT PETITIONER WAS SUBJECTIVELY AWARE THAT

DEATH OR GREAT BODILY HARM WAS ALMOST CERTAIN TO FOLLOW FROM HIS ACTIONS, IN VIOLATION OF DUE PROCESS OF LAW.

IV.     WAS [PETITIONER] DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR ELICITED EVIDENCE REGARDING OFFICER POWE'S RELIGIOUS BELIEFS.

Respondent has filed an answer to the petition (docket #15).[1]  Upon review and applying the AEDPA standards, I find that Petitioner is not entitled to habeas corpus relief.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the death of Barbara Bardins in Grand Rapids on March 13, 2000.  Petitioner was tried before a jury on December 4-14, 2000.

Grand Rapids firefighters were dispatched to 1040 Temple at 12:30 p.m. on March 13, 2000.  (Tr. II, 94.)[2]  Upon their arrival, firefighters could see smoke coming from the rear of the two-story wood house.  (Tr. II, 96.)  They entered the house through the back storm door, which was unlocked.  (Tr. II, 115.)  There was heavy smoke in the back of the house.  (Tr. II, 122.)  The fire was reported as a basement fire, so two of the firefighters proceeded directly toward the basement.

---

[1] Respondent's answer addresses only Grounds I though III.

[2] The trial transcripts will be referred to as follows:
12/04/00 Trial (docket #27), "Tr. I"
12/05/00 Trial (docket #28), "Tr. II"
12/06/00 Trial (docket #29, "Tr. III"
12/07/00 Trial (docket #30), "Tr. IV"
12/08/00 Trial (docket #31), "Tr. V"
12/11/00 Trial (docket #32), "Tr. VI"
12/12/00 Trial (docket #33), "Tr. VII"
12/13/00 Trial (docket #34), "Tr. VIII"
12/14/00 Trial (docket #35), "Tr. IX"
12/14/00 Verdict (docket #36), "Verdict Tr."

(Tr. II, 122.)  After the firefighters broke the basement windows and the smoke began to clear, they discovered the victim's charred body on the landing of the basement stairway.  (Tr. II, 104-05, 123-24.)  The body was in a sitting position, leaning up against the wall.  (Tr. II, 108.)  It was partially obscured by debris from the fire.  (Tr. II, 147.)  Firefighters observed a gasoline can in the basement.  (Tr. II, 127.)  A dog was found dead in the living room.  (Tr. II, 112.)

Imants Bardins, the victim's husband, testified that the victim was forty-one years old at the time of her death.  (Tr. III, 4.)  Mr. Bardins testified that Petitioner lived next door to him and his wife for twelve years.  (Tr. III, 5.)  They had a friendly relationship as neighbors.  (Tr. III, 5.)  Petitioner moved out of his house about four months before Mrs. Bardins' death and rented it out.  (Tr. III, 6.)  Mr. Bardins last saw Petitioner a couple of weeks before Mrs. Bardins' death, when he was cleaning up his property.  (Tr. III, 6.)  According to Mr. Bardins, Petitioner was in Bardins' basement about a dozen times.  (Tr. III, 6.)  Mr. Bardins kept marijuana in his basement that he smoked and sold to friends, including Petitioner.  (Tr. III, 6-7.)  Several months before Mrs. Bardins' death, Mr. Bardins cashed a check for Petitioner so he could bail his son out of jail.  (Tr. III, 30-31.)  Mr. Bardins discovered that the check was written on a closed account.  Mr. Bardins approached Petitioner about the check when he was moving out, but Petitioner said that he did not have the money to pay back Mr. Bardins.  (Tr. III, 31, 39.)  Mr. Bardins and Petitioner did not have a confrontation about the money and Mr. Bardins had no reason to fear or distrust Petitioner.  (Tr. III, 30-31.)  Mr. Bardins believed that his wife would have allowed Petitioner into the house even when he was not home.  (Tr. III, 30.)

On March 13, 2000, Mr. Bardins left for work at 6:00 a.m.  (Tr. III, 8.)  When he left, Mrs. Bardins was in the process of getting ready for work.  (Tr. III, 8.)  He locked the back door on

- 3 -

his way out and started Mrs. Bardins' car to warm it up for her.  (Tr. III, 9, 11-12.)  He locked the car; the victim had a second set of keys to unlock the car when she was ready to leave.  (Tr. III, 9.)  Mr. Bardins learned about his wife's death when police came to his place of work at about 3:15 p.m. that afternoon.  (Tr. III, 10.)  Mr. Bardins testified that he did not have a garage, so he stored two gas cans in the basement under a cabinet.  (Tr. III, 13-14.)  The cabinet was open underneath, so the cans were stored in plain view.  (Tr. III, 14.)  Mr. Bardins testified that he did not leave a gas can on the table where it was found after the fire.  (Tr. III, 15.)  Mr. Bardins also stored a box of wooden kitchen matches on a bench in the basement.  (Tr. III, 15-16.)  He testified that an extension cord that he stored on a hook on the basement wall was missing after the fire.  (Tr. III, 28.)

Shante Shaw testified that he lived with his cousin at 1028 Temple.  (Tr. III, 61.)  Shaw was a student at Creston High School.  He left home to walk to the bus stop at 7:15 a.m. on March 13.  (Tr. III, 62.)  As he passed 1040 Temple, he heard something like a smoke detector or alarm going off inside the house.  (Tr. III, 62.)  Shaw did not see or smell any smoke.  (Tr. III, 65.)  Shaw did not think that there was a car in the driveway, but he could not be certain.  (Tr. III, 62-64.)

Patricia Bell testified that she lived at 1334 Kalamazoo, about a block from the Bardins' home.  (Tr. III, 68.)  Bell testified that on the morning of March 13, between 6:50 and 6:55 a.m., Petitioner came to her house asking for a ride. (Tr. III, 69, 71.)  Bell knew Petitioner because he had lived next door to Bell's cousin, Jackie Mayweather, on Temple.  (Tr. III, 69-70.)  Petitioner said that he wanted to go to Division and Hall.  Bell told Petitioner that she was going the other direction to get to work.  (Tr. III, 70.)  Petitioner was at the door for about two minutes before he left. (Tr. III, 71.)  Bell thought it was strange for Petitioner to ask her for a ride because she had not seen him for six months.  (Tr. III, 71-72.)  Bell's car was already running in the driveway when Petitioner

came to the door. (Tr. III, 84.) When Bell left for work, she saw Petitioner walking up Temple. (Tr. III, 72.) Bell's daughter, Tamela Bell, answered the door to Petitioner on the morning of March 13. (Tr. III, 78.) Tamela's testimony was consistent with Bell's. (Tr. III, 78-85.)

Ron Burgess testified that he owned a car dealership in Michigan City, Indiana. (Tr. III, 45.) At about 8:40 a.m. (central time) on the morning of March 13, a middle-aged black male came to the dealership and told Burgess that he was interested in purchasing an Astrovan. (Tr. III, 47-48, 50.) The man took the van for a test drive and never returned. (Tr. III, 48.) The man left the car that he was driving in the parking lot. (Tr. III, 49.) Burgess testified that Petitioner looked like the man who took the van, but Burgess could not positively identify him at trial. (Tr. III, 47.) Burgess' mother, Betty Kelly, also was at the dealership on the morning of March 13. (Tr. III, 55.) Kelly positively identified Petitioner as the man who asked to take the van for a test drive and never came back. (Tr. III, 55-59.)

Pablo Martinez, a fire investigator with the Grand Rapids Police Department, investigated the fire at 1040 Temple. (Tr. IV, 90-92.) Because the cause of the fire and the fatality were unknown, Martinez called the police to join the investigation. (Tr. IV, 100.) After the medical examiner arrived and pronounced the victim dead, the fire fighters removed the large debris that had fallen on the victim's body during the fire. (Tr. IV, 102-03.) Martinez then used a small brush to remove the smaller debris from the victim's body. (Tr. IV, 104.) As he worked, Martinez noticed an orange extension cord wrapped around the back of the victim's neck, cris-crossed over her chest, and then wrapped around her ankles. (Tr. IV, 104-105.) Martinez also observed severe burning in her pubic/abdominal area. (Tr. IV, 104.) After Martinez finished cleaning the victim, he began sifting through the debris lying on the stairway around her. (Tr. IV, 106.) Martinez also observed

- 5 -

that the victim had a broken left wrist. (Tr. IV, 104.) When the victim's body was moved, Martinez noted that she did not have any clothing remaining underneath her buttocks, where she had been in contact with the floor. (Tr. IV, 109.)

Martinez brought in an arson-detection dog to search for accelerants. (Tr. IV, 111-12.) The dog walked on the stairway, landing and around the basement. (Tr. IV, 112.) The dog alerted only to one area on the basement floor. (Tr. IV, 112; Tr. V, 44.) Martinez took several swabs from the area, which smelled like gasoline. (Tr. IV, 112.) Martinez inspected the water heater and did not see any damage. (Tr. IV, 114.) He also determined that the furnace and the clothes dryer could not be the source of the fire because they did not have gas pilot lights. (Tr. IV, 115-16.) Martinez testified that there was no fire damage to the basement ceiling, which indicated that there was not an intense fire in that area. (Tr. IV, 116.) The only area in the basement where the ceiling was damaged was in the stairwell where the body was found. (Tr. IV, 117.) Martinez believed that the victim was set on fire in the stairwell. He believed that flammable liquid was poured on the victim's lap and pooled in that area, causing severe burning. (Tr. IV, 121; Tr. V, 52.) Martinez could not identify the ignition source for the victim, but opined that it burned in the fire. (Tr. IV, 125.) Once the victim was ignited, Martinez believed that another person could not have passed her on the stairs without suffering injury from the extreme heat and flames generated by gasoline. (Tr. V, 7.) If a person was above the victim on the stairwell, he could have escaped without injury. (Tr. V, 9.)

Martinez concluded that the gas pilot light on the water heater ignited vapors from the liquid accelerant, causing small fires in the basement next to the hot water heater. (Tr. IV, 118, 121-22, 125; Tr. V, 65, 77.) However, Martinez thought it "highly unlikely" that the hot water heater

ignited the accelerant poured on the victim because she was too far away from it.  (Tr. IV, 125-26.)

Martinez did not believe that the victim was ignited in the basement and somehow made it to the

stairway landing because of the lack of fire damage in the basement.  (Tr. V, 9.)  He opined that the

fire on the back of the chair in the basement began when a flammable liquid ran down the back of

the chair and ignited.  (Tr. IV, 119.)  All of the accelerant may have burned in the fire, which would

account for the arson dog's failure to detect an accelerant on the back of the chair.  (Tr. IV, 119-20.)

Martinez testified that the Bardins' dog died from smoke inhalation.  (Tr. IV, 124.)

       Dr. David Start performed the autopsy on the victim. (Tr. V, 83.)  Dr. Start observed

extensive charring or burning of the skin surface.  (Tr. V, 84.)  He also observed an extension cord

that wrapped around the ankle area, up over the front of the body and around her neck.  (Tr. V, 84.)

Dr. Start testified that the most extensive area of charring was the pelvic area, where the charring

extended into portions of the internal organs.  (Tr. V, 85.)  He opined that the severe charring in the

pelvic area was caused by the use of an accelerant.  (Tr. V, 85-86.)  Dr. Start found some small

fragments of clothing, mostly in the areas where the extension cord wrapped around her body.

(Tr. V, 86.)  The full body x-ray was negative for the presence of foreign metallic objects, such as

a bullet.  (Tr. V, 88.)  Dr. Start concluded that the victim was alive at the time of the fire and died

from inhaling the products of combustion, including smoke and hot gasses.  (Tr. V, 90, 95.)  He

estimated that she would have been conscious for several seconds after the fire began.  (Tr. V, 99-

100.)  Death would have occurred some minutes later, as she continued to be deprived of oxygen.

(Tr. V, 100.)  He also found that the extension cord was tied around the victim's ankles before her

death.  (Tr. V, 96.)  Dr. Start further opined that the victim was in a seated position on a hard surface

when the fire occurred.  (Tr. V, 97.)

Douglas Powe of the Caldwell Parish Sheriff's Office in Columbia, LA, testified that he first came into contact with Petitioner after March 21, when Petitioner was being held in the Caldwell Parish jail on charges unrelated to this case.  (Tr. IV, 4-5.)  When he was arrested in Louisiana, Petitioner gave the false name of Paul Lassiter Smith.  (Tr. IV, 5.)  The Grand Rapids Police Department began making inquiries regarding Petitioner on March 28.  Photographs and finger prints were used to confirm Petitioner's identity as Raymond Smith.  (Tr. IV, 6.)  Detectives DeJong and Winters of the Grand Rapids Police Department flew to Louisiana and interviewed Petitioner on March 30.  (Tr. IV, 6-7.)  Powe transported Petitioner from the jail to the interview location across the street.  (Tr. IV, 7.)

After Petitioner's interview with the Grand Rapids police detectives, Powe booked Petitioner with the additional charge of providing a false name to police.  (Tr. IV, 14.)  Powe testified that he told Petitioner that it wasn't right to give a false name.  (Tr. IV, 15.)  Powe continued before the jury:

> I said these other things, whatever they may be, you know, they're not right either. I said, you know, there's a lot of things we're going to have to answer for in life, and this is just part of life and what makes life go on.  And one thing [sic] sure, if we're not going to answer for it here, we're going to answer for it when we leave here.

(Tr. IV, 15.)  When asked by the prosecutor what kind of relationship he had built with Petitioner during his incarceration at the Caldwell Parish jail, Powe described an honest and trusting relationship and stated that he "witnessed" to Petitioner.  Powe then added, "I feel strongly about God, Jesus, and my belief, and I believe he's the only one that can help us, the true things, and I still believe that."  (Tr. IV, 16.)  While transporting Petitioner to the Clark's Detention Center, Powe testified that he continued to talk to Petitioner about God.  (Tr. IV, 19.)  When they arrived at the detention center, Petitioner allegedly stated that he knew he had "done wrong" and asked Powe if

the Grand Rapids detectives would talk to him again in the morning.  (Tr. IV, 19-20.)  Petitioner said

something about smelling gas.  (Tr. IV, 20.)  At Petitioner's request, Powe gave Petitioner a bible

in his cell.  (Tr. IV, 21.)  Powe testified that when he gave Petitioner the bible he told him, "you got

to do a lot of soul searching.  You need to read this book a little bit tonight and make your mind up

what to do."  (Tr. IV, 21-22.)

       The next morning, Powe took the Grand Rapids detectives to the detention center.

Powe testified that when he went to Petitioner's cell, he saw Petitioner lying on the bottom bunk

with the Bible on his chest.  (Tr. IV, 23-24.)  Petitioner indicated that he was ready to tell the truth.

(Tr. IV, 24-25.)  Powe told him to "make peace with God."  (Tr. IV, 25.)  Petitioner began sobbing

and they embraced.  (Tr. IV, 25.)  On cross-examination, Powe admitted that the use of religious

beliefs is a common interrogation technique.  (Tr. IV, 36.)

       R.J. Winters of the Grand Rapids Police Department testified that at the time of the

victim's death he was investigating Petitioner concerning an unrelated matter.  (Tr. VII, 5.)

Detectives Winters and DeJong went to Louisiana to interview Petitioner regarding both matters.

(Tr. VII, 8.)  The detectives first interviewed Petitioner on March 30, 2000.  (Tr. VII, 11-12.)  An

edited version of the taped interview was played for the jury.  (Tr. VII, 15-20.)[3]  The first half of the

March 30 interview concerned matters unrelated to the charges at issue in this case.   When

questioned about what occurred at the Bardins' residence, Petitioner told the Detectives that Frank

Suggs stole Mrs. Bardins' car on the morning of March 13, while it was running in the driveway.

(3/30/00 Interview Transcript (Int. Tr. I), 90-95, 97, docket #39.)  Petitioner indicated that Suggs had

gone over to the Bardins' house and somehow gotten Mrs. Bardins' car keys.  (Int. Tr. I, 102, 120,

---

[3] The interview tapes from March 30 and 31, 2000, were not transcribed as part of the trial transcript, but the
jurors were provided with an edited transcript of each of the interviews.  A copy of those transcripts are attached to the
Michigan Supreme Court briefs (docket #39).

150.)  Petitioner opined that Suggs tried to make Mrs. Bardins tell him where to find Mr. Bardins'

"weed."  (Int. Tr. I, 145-48, 162.)  Suggs drove Petitioner to Michigan City, where Petitioner stole

a van.  (Int. Tr. I, 91-95.)  Petitioner repeatedly denied that he went to the Bardins' house or that he

stole Mrs. Bardins' car.  (Int. Tr. I, 103-05, 117-19, 122, 179.)

        Detective Matthew DeJong testified that he and Detective Winters interviewed

Petitioner for a second time on March 31.  (Tr. VIII, 7.)  An edited version of the taped interview was

played for the jury.  (Tr. VIII, 9.)  Early in the interview, Petitioner began crying and said "It was an

accident."  (3/31/00 Interview Transcript (Int. Tr. II), 1, docket #39.)  Petitioner stated that he went

into the house and asked Mrs. Bardins if he could use the phone.  (Int. Tr. II, 4.)  Petitioner was

afraid of the Bardins' dog, Junior, and he penned him in the living room.  (Int. Tr. II, 4.)  Petitioner

asked Mrs. Bardins if she had any money.  When she responded "no," he asked her if Mr. Bardins

had any "weed" in the house.  (Int. Tr. II, 4.)  Mrs. Bardins again answered, "no."  (Int. Tr. II, 4.)

Petitioner told Mrs. Bardins that he was going to search the basement for marijuana because he was

on crack and desperately needed money to buy more.  (Int. Tr. II, 4.) Petitioner took Mrs. Bardins

to the basement and made her sit in a chair.  (Int. Tr. II, 4.)  Petitioner told the officers that Mrs.

Bardins kept trying to go upstairs so she could turn Junior loose.  (Int. Tr. II, 4.)  She was making

Petitioner nervous, so he took an extension cord from the wall and wrapped it around her while she

sat in the chair.  (Int. Tr. II, 4.)  Petitioner told the detectives that he was just trying to scare Mrs.

Bardins because he wanted her to tell him "where the weed was."  (Int. Tr. II, 4.)

        Petitioner stated that when he could not find any marijuana in the basement Mrs.

Bardins offered to go to the bank with Petitioner and get him $200.  (Int. Tr. II, 5.)  Bardins was

wearing a black pouch around her waist that contained some of her personal belongings, but she told

Petitioner that her bank card was upstairs in the bedroom.  (Int. Tr. II, 5, 8.)  Petitioner told the

officers that he was very afraid of the dog, so he threatened to pour gas on the dog if Mrs. Bardins let him loose.  (Int. Tr. II, 5, 9.)  Petitioner picked up a gas can from the basement and approached Bardins.  As Petitioner loosened the cord so Bardins could walk, Petitioner continued to threaten to pour gas on the dog and light him.  (Int. Tr. II, 6, 9, 14-16, 30-31, 33.)  Bardins began to panic and started batting at Petitioner and telling him to put down the gas.  (Int. Tr. II, 6, 9, 14.)  Petitioner claimed that as he tried to calm her down, "the gas was just goin' every damn where." (Int. Tr. II, 5, 30-31.)  Petitioner claimed that he saw a flame streak across the floor from the direction of the furnace and ignite Mrs. Bardins.  (Int. Tr. II, 7, 9, 15, 32.)  He denied using a lighter, striking a match, or doing anything to start the fire.  (Int. Tr. II, 5, 15-16.)  Petitioner was not certain whether he had a lighter with him, but admitted that he used a lighter to smoke crack the night before.  (Int. Tr. II, 16.)  Petitioner claimed that Mrs. Bardins "was just like all over the place.  She was knockin' over stuff."  (Int. Tr. II, 10, 35.)  He allegedly tried to hug her to put out the flames, but stopped because he was getting burnt.  (Int. Tr. II, 7, 9-10, 35.)  Petitioner told the officers that the last time he saw Mrs. Bardins she was sitting by the sink in the basement.  (Int. Tr. II, 36-37.)

Petitioner told the officers that he ran out of the house because he thought it was going to blow up.  (Int. Tr. II, 36.)  He drove away in Mrs. Bardins' car.  (Int. Tr. II, 18.)  He went home and got some clothes and a few other things and left town.  (Int. Tr. II, 19.)  Petitioner stated that while he was in Michigan City he bought cigarettes and a lighter at a gas station and dispensed gas from the gas station into a plastic bottle.  (Int. Tr. II, 10-11.)  He then used the gas and lighter to burn the clothing that he was wearing during his encounter with the victim.  (Int. Tr. II, 10-12.)  Petitioner admitted stealing the minivan in Michigan City.  He removed the license plate and replaced it with one he stole from a car in Iowa.  (Int. Tr. II, 21-22.)

Kevin Streeter, a forensic scientist for the Michigan State Police, tested evidence collected at the crime scene, including cotton swabs taken from the basement floor, a gym shoe found next to the victim's body, a piece of electrical cord with some of the victim's burnt clothing on it, and some clothing and debris in a separate package. (Tr. VI, 4.) Streeter found the presence of gasoline on the cotton swabs and on the clothing and debris. (Tr. VI, 5.) Streeter explained that the failure to detect gasoline on the other items did not mean that they never had gasoline on them. (Tr. VI, 6.) The gasoline could have been consumed by the fire. (Tr. VI, 6.) Another forensic scientist, Ann Hunt, testified that she found no evidence of sexual assault from rape kit samples taken during the victim's autopsy. (Tr. VI, 11-14.)

At the conclusion of trial, the jury found Petitioner guilty of first-degree felony murder. (Verdict Tr., 3.) On February 5, 2001, Petitioner was sentenced to a mandatory term of life imprisonment without the possibility of parole. (Sentencing Tr., 8, docket #37.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on April 17, 2002, raised the same four issues presented in this application for habeas corpus relief. (See Def.-Appellant's Br. on Appeal, docket #38.) By unpublished opinion issued on June 26, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 6/26/03 Mich. Ct. App. Opinion ("MCOA Op."), docket #38.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court, raising the same four claims. By order entered December 30, 2003, the Michigan Supreme

Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See 12/30/03 Mich. Ord., docket #39.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state

courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

- 14 -

## Discussion

I.      Admission of Petitioner's Statements from March 30 and 31, 2000

In his first ground for habeas corpus relief, Petitioner claims that his statements to Grand Rapids police detectives on March 30 and 31, 2000, were the result of unlawful police coercion, and, thus, were admitted at trial in violation of his due process rights. Defense counsel brought a pre-trial motion to suppress statements Petitioner made to Grand Rapids police detectives on March 30 and 31, 2000 and April 17, 2000. The defense argued that the statements were rendered involuntary by the abusive treatment Petitioner received by police officers at the time of his arrest and subsequent incarceration in Louisiana. The trial court held a three-day evidentiary hearing November 27-30, 2000. Petitioner testified that he was arrested in LaSalle Parish on March 19, 2000, after leading Louisiana police officers on a car chase. (SH Tr. I, 6-7, 63-64)[4] Petitioner claimed that he was beaten "pretty bad" by the arresting officers. (SH Tr. I, 12-14, 65-72.) Following his arrest, Petitioner was taken to a police station, where officers continued to beat Petitioner while he was being processed and questioned. (SH Tr. I, 15-16, 74-79, 88-92.) After about thirty minutes, Petitioner was taken to the LaSalle Parish Jail. (SH Tr. I, 90.) Petitioner first was beaten by an officer for five or ten minutes outside of the jail. (SH Tr., 94-96.) He then was taken inside the jail and put him in a room where officers beat him with a flashlight and a black leather paddle. (SH Tr. I, 99-100.) After about four and one half hours, Petitioner was taken to the "the hole." (SH Tr. I, 103.) In the hole, Petitioner was chained to a bench and had to relieve himself

---

[4] The suppression hearing transcripts will be referred to as follows:
11/27/00 Suppression Hearing (docket #22), "SH Tr. I"
11/28/00 Suppression Hearing (docket #23), "SH Tr. II"
11/30/00 Suppression Hearing (docket #25), "SH Tr. III"
12/01/00 Suppression Hearing (docket #26), "SH Tr. IV"

on the floor.  (SH Tr. I, 7-11, 81-85, 92.)  He shared the cell with Anthony Green.  (SH Tr. I, 113.)
The second night he was at the jail he received another beating from four officers that resulted in a
broken rib.  (SH Tr. I, 17-18.)  Officers also terrorized Petitioner with police dogs.  (SH Tr. I, 19-20,
114-20.)

Petitioner testified that he was transferred to the Caldwell Parish jail on March 21,
2000.  (SH Tr. I, 25-26.)  Petitioner gave statements to the Grand Rapids police detectives on March
30 and 31.  (SH Tr. I, 28.)  He testified that he was not physically abused at the Caldwell Parish jail
or by the Grand Rapids detectives.  (SH Tr. I, 27, 33; SH Tr. II, 4.)  However, at the March 30
interview, the Grand Rapids detectives allegedly told him: "They'll kick the shit out of you till you
get ready to talk.  You can stay  down here forever and take that everyday.  If I was you, I would go
on and admit to it.  And when you get up there [to Michigan], you live to fight another day."  (SH
Tr. I, 33.)  The night of March 30, Petitioner was sent to the Caldwell Parish Detention Center.  (SH
Tr. I, 33.)  During the night, an officer allegedly came in and covered the camera lense in Petitioner's
cell with a wad of wet toilet paper.  (SH Tr. I, 35-36.)  Corrections officers changed Petitioner into
a paper gown and chained him face-up on his metal bed.  (SH Tr. I, 36.)  Petitioner testified that the
officers pepper sprayed him without any provocation.  The officers also beat the bottom of his feet
with a black leather paddle.  (SH Tr. I, 38.)  They also struck him in the area where his rib was
broken.  (SH Tr. I, 38-39.)  After beating him for about half an hour, another man came in and asked
Petitioner if he was ready to talk.  (SH Tr. I, 40.)  They told Petitioner to stay awake all night and
pepper sprayed him in the face and "private area" if he dozed off.  (SH Tr. I, 41.)

Petitioner testified that he talked to the Grand Rapids detectives on March 31 because
he feared that they were going to kill him in Louisiana.  (SH Tr. I, 42, 44.)  He claimed that the

beatings continued at the Caldwell Parish Detention Center until Petitioner was returned to Michigan on April 17.  (SH Tr. I, 47.)  Petitioner gave another statement at the Kent County Jail on April 17.  (SH Tr, I, 52.)  He asked Detectives DeJong and Winters for a lawyer before the interview took place, but his request was ignored.  (SH Tr. I, 54-55.)

Anthony Green testified that he was in the LaSalle Parish jail on March 19, 2000.  (SH Tr. II, 38-39.)  He spent six days in "the hole."  He had been there for two or three days when Petitioner arrived.  (SH Tr. II, 40.)  Petitioner complained to Green that he had been involved in a police chase and they beat him up.  (SH Tr., 48.)  Each of the men had a wood bench with no mattress or pillow.  (SH Tr., 43-44.)  Petitioner received a blanket at some point during his stay.  (SH Tr., 43.)  Green confirmed that Petitioner had shackles on his hand and feet, and could not reach the hole in the center of the room that was used as the toilet.  (SH Tr. II, 41.)  While they were in the hole, the men were not given wash basins or any other means to clean themselves.  (SH Tr. II, 42.)  Green recalled Petitioner being removed from the cell shortly after he arrived.  (SH Tr. II, 45, 50.)  When Petitioner came back, he told Green "about when the men kickin' him in the mouth and his rib was hurtin' with a knot on them, and stuff like that."  (SH Tr. II, 45.)

Detective Robert Winters of the Grand Rapids Police Department confirmed that he and Detective DeJong traveled to Louisiana and interviewed Petitioner on March 30 and 31.  (SH Tr. II, 71-112.)  Winters testified that Petitioner appeared well on March 30 and had no visible injuries.  (SH Tr. II, 76.)  Petitioner told the detectives that he had been mistreated by the arresting officers and at the LaSalle Parish jail.  (SH Tr. II, 88-89.)  The following day, Petitioner's physical appearance was the same, but he was more emotional.  (SH Tr. II, 82.)  Petitioner did not claim that

he was mistreated overnight at the detention center.  (SH Tr. II, 82.)  Petitioner told the officers that he had a bible in his cell and had been reading the bible.  (SH Tr. II, 82.)

            Detective Powe testified that his first contact with Petitioner was on March 30, when Powe transported him to the interview with the Grand Rapids detectives.  (SH Tr. III, 8.)  Petitioner did not appear injured and did not complain about his treatment at the Caldwell Parish jail.  (SH Tr. III, 8.)  Petitioner, however, complained of his previous treatment at the LaSalle Parish jail.  (SH Tr. III, 29.)  He complained of being beaten, pepper sprayed and terrorized by dogs at the LaSalle Parish jail.  (SH Tr. III, 29-30.)  After the March 30 interview, Powe and Caldwell County Investigator Becky Ledbetter transferred Petitioner to the Caldwell Parish Detention Center. Petitioner was placed in solitary confinement at the detention center because he was considered a security risk.  (SH Tr. III, 13.)  Powe testified that he and Petitioner had a deep conversation about "God and what it takes to be a good person with high morals."  (SH Tr. III, 14.)  As a result of that conversation, Petitioner asked Powe to arrange another meeting with the Grand Rapids detectives because he wanted to tell them the truth.  (SH Tr. III, 15.)  At Petitioner's request, Powe got a Bible for Petitioner and gave it to him in his cell. (SH Tr. III, 17.)  Powe woke Petitioner the following morning for his second interview with the Grand Rapids detectives.  (SH Tr. III, 20.)  They had another conversation about God and telling the truth.  (SH Tr. III, 21.)  According to Powe, Petitioner looked the same as the night before.  (SH Tr. III, 22.)

            Deputy Tracy Clark of the LaSalle Parish Sheriff's Department testified that officers did not use excessive force in effecting Petitioner's arrest following the high-speed chase.  (SH Tr. III, 109-100.)  Clark denied that he struck Petitioner or sprayed him with a chemical agent.  (SH

Tr. III, 112-13.)  Clark further testified that he was not aware of Petitioner being beaten or otherwise mistreated at the LaSalle Parish jail.  (SH Tr. III, 127-37.)

   The trial court ruled that the statements given by Petitioner on March 30 and 31 were admissible, while the statement given on April 17 was inadmissible during the prosecutor's case-in-chief and could be used only for purposes of impeachment.  (SH Tr. IV, 9.)  The trial court found that Petitioner was mistreated at the LaSalle Parish Jail as badly as he claimed.  (SH Tr. IV, 11-12.)  The court opined that had Petitioner given a statement while in the custody of the LaSalle Parish Jail, it would have been inadmissible.  (SH Tr. IV, 13.)  The court found that Petitioner spent eight days at the Caldwell Parish jail, where he admittedly was treated well, before he was interviewed by the Grand Rapids police detectives on March 30 and 31.  (SH Tr. IV, 13-14.)  The Court was "satisfied that the passage of time, the change of location, and the change in treatment by the different officers rendered irrelevant to this particular case the coercion which had occurred the first few days in LaSalle Parish."  (SH Tr. IV, 15.)  Accordingly, the Court found that Petitioner's March 30 and 31 statements were not taken in violation of his due process rights.  The court rejected Petitioner's claim that he was beaten on the night of March 30.  (SH Tr. IV, 14.)  The court relied upon the testimony of Powe and Bradley and the lack of any specific complaint by Petitioner during the March 31 interview.  (SH Tr. IV, 14.)  The court concluded, however, that the April 17 statement was taken in violation of Petitioner's Sixth Amendment right to counsel.  (SH Tr., IV, 20, 23.)  Consequently, the April 17 statement was excluded at trial.

   The Michigan Court of Appeals affirmed the trial court's finding that the March statements were not coerced, and, thus, were admissible at trial:

   Defendant first argues that the trial court erred in denying his motion to suppress two statements given to Michigan detectives while he was in custody in

Louisiana. We disagree. In reviewing whether there was a valid waiver of the right against self-incrimination and whether a confession was properly admitted, an appellate court conducts a de novo review of the entire record. *People v Daoud*, 462 Mich 621, 629; 614 NW2d 152 (2000). The trial court's findings of fact are reviewed for clear error. *Id.*

When a defendant challenges the admissibility of a confession, the prosecution must prove by a preponderance of the evidence that there was a valid waiver of the right against self-incrimination. *Id.* at 634. A valid waiver must be voluntary and knowing and intelligent. *Id.* at 633. This is a bifurcated inquiry to be determined objectively upon the totality of the circumstances. *Id.* at 633-634. In this case, defendant only challenges the voluntariness aspect of his statements. A waiver of the right to remain silent is voluntary if it is "the product of a free and deliberate choice rather than [police] intimidation, coercion, or deception." *Id.* at 635, quoting *Colorado v Connelly*, 479 US 157, 170; 107 S Ct 515; 93 L Ed 2d 473 (1986).

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Wells*, 238 Mich App 383, 387; 605 NW2d 374 (1999), quoting *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988)].

Where, as here, a defendant claims that a statement is involuntary because of police intimidation or coercion, he must show both misconduct and causation. See *Wells*, *supra* at 387-389. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 388, quoting *Connelly*, *supra* at 164.

In this case, while there was evidence that defendant had previously been physically abused by Louisiana police authorities, there were no allegations of abuse by the Michigan detectives who took defendant's statements. Further, we conclude that the trial court properly found that there was no causal relationship between the earlier abuse by the Louisiana authorities and defendant's subsequent statements to the Michigan detectives. As the trial court found, after defendant was mistreated in

LaSalle Parish, Louisiana, he was transferred to Caldwell Parish and, by his own accounts, was treated well there for approximately a week before the Michigan officers arrived. Defendant was interrogated for approximately five hours on March 30, 2000, but did not confess at that time. However, when questioning resumed on March 31, 2000, he gave an incriminating statement almost immediately. In all, defendant was held for a total of twenty-nine days in Louisiana. He was arraigned a day or two after arriving at Caldwell Parish, approximately five days after his arrest, and before defendant gave his statements to the Michigan detectives.

The facts of this case present a lesser connection between the prior abuse and the later confession than the facts presented in *Wells*, *supra* at 389-390. Further, we are not persuaded that the length of defendant's interrogation, the delay in initially bringing defendant before a magistrate, or the length of defendant's detention rendered his confession involuntary. The trial court did not err in denying defendant's motion to suppress. *Id.* at 390.

(MCOA Op., 1-2.)

Under the deference to state-court determinations required by AEDPA, I cannot say that the Michigan Court of Appeals unreasonably applied federal law as reflected in Supreme Court precedents. Under clearly established Supreme Court law, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton,* 474 U.S. 104, 109 (1985). The question in each of these cases is whether a defendant's will was overborne at the time he confessed. *Reck v. Pate,* 367 U.S. 433, 440 (1961); *see also Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th Cir. 1994) ("An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist."). Coercive police activity is necessary for a confession to be found involuntary under the Due Process Clause of the Fourteenth Amendment. *See Colorado v. Connelly,* 479 U.S. 157, 167 (1986); *Clark v. Mitchell,* 425 F.3d 270, 283 (6th Cir. 2005). Petitioner must prove that his will was overborne *because* of the coercive police activity in question. *See McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (emphasis added). If the police misconduct at issue was not the "crucial motivating factor" behind Petitioner's decision to confess, the confession may not

be suppressed. *See id.* (citing *Connelly*, 479 U.S. at 163-164). In determining whether a defendant's will was overborne, the Court looks at the totality of the circumstances surrounding the confession. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). Factors considered in assessing the totality of the circumstances include the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep. *Id.*; *McCalvin v. Yukins*, 444 F.3d 713, 719 -720 (6th Cir.), *cert. denied*, 127 S. Ct. 510 (2006).

The primary factor at issue in this case is the physical and psychological abuse that Petitioner was subjected to at the LaSalle Parish jail. While the trial court found that Petitioner was abused during his stay at the LaSalle Parish jail on March 19-21, 2000, Petitioner admitted that he was treated well at the Caldwell Parish jail from March 21-30. Petitioner was interviewed by the Grand Rapids detectives in Caldwell Parish on March 30 and 31, more than a week after he was transferred to Caldwell Parish. Petitioner does not allege that he was mistreated in any way by the detectives during those interviews. During the interview on March 30, Petitioner consistently denied that he had any contact with the victim on the day of her death. However, on March 31, Petitioner gave incriminating statements almost immediately. The fact that Petitioner did not immediately confess on March 30 suggests that the abusive treatment he received more than a week earlier at the LaSalle Parish jail was not a crucial motivating factor in his decision to confess. Therefore, as discussed by the Michigan Court of Appeals, Petitioner cannot establish a causal connection between the coercive police activity and his confession.

Petitioner contends that several other factors mitigate against a finding of voluntariness, including the length of his detention before the statements were given (from March 19 to March 30), the delay in bringing him before a magistrate, and the prolonged nature of the questioning on March 30.  At the time he gave his confession, Petitioner had been held on unrelated charges in Louisiana for eleven days, from March 19 until March 30.  He was arraigned approximately five days after his arrest, which was before he gave his statements to the Grand Rapids detectives.  Moreover, while Petitioner was interviewed by the Grand Rapids detectives for over five hours on March 30, Petitioner did not incriminate himself during that interview other than to say that he rode in Mrs. Bardins' car after Suggs stole it.  He did not confess to his contact with the victim until the following day.  Other factors weigh in favor of a finding of voluntariness; e.g., Petitioner was advised of his *Miranda* rights; he was approximately forty-eight years of age; and he was experienced with the criminal justice system.  Based upon the totality of the circumstances in this case, it was objectively reasonable for the Michigan Court of Appeals to hold that Petitioner's confession was voluntary.

Although some of the circumstances surrounding Petitioner's confession were perhaps coercive, they do not warrant a conclusion that the Michigan Court of Appeals' decision was objectively unreasonable.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti,* 537 U.S. 19, 24-25 (2002) (per curiam). Under the deference required by AEDPA, and given the factors supporting a finding that Petitioner's confession was voluntary, the decision of the Michigan Court of Appeals was a reasonable application of federal law.

II.     Trial Court's Ruling Regarding Bad Acts Evidence

The prosecutor filed notice that she intended to offer evidence of other crimes, wrongs or acts, i.e., "bad acts," pursuant to MICH. R. EVID. 404(b).  The "bad acts" at issue included pending car jacking charges in Grand Rapids; car jacking charges in Dallas, Texas; fleeing and eluding police officers, possession of a stolen vehicle and attempted escape from the Caldwell Parish Detention Center.  The prosecutor agreed not to use evidence concerning the Grand Rapids car jacking, but sought to admit evidence regarding the remaining incidents.  Defense counsel objected to admission of the bad acts evidence.  Following a hearing on December 1, 2000, the trial court ruled that the evidence was admissible.  According to Petitioner, defense counsel subsequently entered into a stipulation with the prosecutor that the prosecution would not use the above reference bad acts evidence, and the defense would not claim or argue at trial that Petitioner's statements were the result of police coercion.  Pursuant to the stipulation, the bad acts evidence was not admitted at trial.

In his habeas petition, Petitioner argues that the trial court's admission of the bad acts evidence under MICH. R. EVID. 404(b) violated his due process rights.  He further claims that his trial counsel was ineffective for entering into a stipulation regarding the bad acts evidence.  In rejecting Petitioner's claim on appeal, the Michigan Court of Appeals stated:

> Defendant next argues that the trial court erred in granting the prosecutor's pretrial motion to introduce evidence of other bad acts. We conclude that this issue is waived. The bad acts evidence was never introduced at trial pursuant to the parties' stipulation. The stipulation stated that it would not be used, provided defendant refrained from claiming or arguing at trial that his statements to Michigan detectives were the result of coercion by the Louisiana police. Because the challenged evidence was never introduced at trial pursuant to defendant's own stipulation, defendant has waived any error stemming from the trial court's pretrial ruling to allow the evidence. See *People v Riley*, 465 Mich 442, 449; 636 NW2d 514 (2001). Further, we reject defendant's claim that defense counsel was ineffective for entering into this stipulation. Counsel's decision involved a classic matter of trial strategy, which this Court will not second guess. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721

- 24 -

(1995); *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994). The fact that the decision was prompted by a pretrial ruling that defendant maintains was incorrect does not remove it from the realm of trial strategy. Defendant may not rely on hindsight to argue that counsel must have made the wrong choice. *LaVearn*, *supra* at 216.

(MCOA Op., 2-3.)

The extraordinary remedy of habeas corpus lies only for a violation of the United States Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry into whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). In this case, the trial court's ruling clearly did not result in the denial of a fair trial as the bad acts evidence was not admitted at trial.

Petitioner's claim of ineffective assistance of counsel also is without merit. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance

- 25 -

prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004).

    Under the stipulation, the prosecutor agreed not to offer the bad acts evidence in exchange for defense counsel's promise not to claim or argue at trial that Petitioner's statements were the result of police coercion. After the trial court ruled that the bad acts evidence was admissible at trial, it was entirely reasonable for defense counsel to make an agreement with the prosecutor to prevent admission of the evidence at trial. The bad acts evidence at issue concerned serious charges, e.g., car jacking, that most certainly would have been damaging to the defense. Moreover, at the time counsel entered into the stipulation, the trial court also had ruled that Petitioner's March statements were admissible at trial. Therefore, while counsel could have argued

to the jury that Petitioner's statements were coerced, he could not prevent them from being admitted at trial.  In light of the trial court's evidentiary rulings, Petitioner fails to overcome the presumption that counsel's decision to enter into the stipulation was sound trial strategy.  *See Strickland*, 466 U.S. at 690.  Accordingly, the decision of the Michigan Court of Appeals was not an unreasonable application of *Strickland*.

III.     Sufficiency of the Evidence

Petitioner claims that the prosecution failed to present sufficient evidence of the requisite intent to support his conviction for first-degree felony murder.  Specifically, Petitioner claims that the prosecutor failed to present sufficient evidence that Petitioner had the requisite intent. A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

In holding that the prosecutor presented sufficient evidence of malice to sustain Petitioner's conviction, the Michigan Court of Appeals stated:

- 27 -

Defendant next argues that there was insufficient evidence of malice to support his conviction of first-degree felony murder. We disagree. We evaluate the sufficiency of the evidence by reviewing the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find every element of the crime proven beyond a reasonable doubt. *People v Petrella*, 424 Mich 221, 268-270; 380 NW2d 11 (1985).

Malice is defined as the intent to kill, to cause great bodily harm, or to do an act with wilful and wanton disregard of the likelihood that the natural tendency of one's actions will be to cause death or great bodily harm. *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). As our Supreme Court observed, "[t]he intent to do an act in obvious disregard of life endangering consequences is malice." *Id.* at 466. Although the *Goecke* Court declined to expressly decide whether this third form of malice is objective or subjective, *id.* at 464-465 and n 26, it quoted with approval from 2 LaFave & Scott, Substantive Criminal Law, § 7.4(b), p 205, as follows:

> [M]ost depraved-heart murder cases do not require a determination of the issue of whether the defendant actually was aware of the risk entailed by his conduct; his conduct was very risky and he himself was reasonable enough to know it to be so. It is only the unusual case that raises the issue -- where the defendant is more absent minded, stupid or intoxicated than the reasonable man.

In the present case, the victim's badly charred body was found on a stairway landing. The victim had been bound with an electrical cord, and there was evidence that gasoline had been poured directly on her before she was set afire. Even if defendant's account of the events is believed, it is clear that he knew that gasoline was flammable because he threatened to pour same on the victim's dog and set it on fire. Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable a rationale jury to find beyond a reasonable doubt that defendant acted with the requisite malice to support his felony murder conviction. See also *People v Djordjevic*, 230 Mich App 459, 462-463; 584 NW2d 610 (1998).

(MCOA Op., 3.)

Petitioner maintains that the prosecutor failed to prove beyond a reasonable doubt that at the time of the offense he was s*ubjectively* aware that the natural result of handling gasoline in the basement would be death or serious bodily injury. Petitioner claims that he was unaware that the water heater could light the gas vapors, and, thus, lacked the subjective mental state for felony-murder. In other words, Petitioner argues that he "simply fail[ed] to consider the possibility that his

- 28 -

conduct could cause serious harm," which may be sufficient to prove manslaughter, but not murder. (Supp. Br., 29.)

While there is no direct evidence that Petitioner intentionally set the victim on fire, there was sufficient circumstantial evidence from which the jury could infer that Petitioner poured the gasoline on the victim and ignited her as she sat on the basement stairway landing. The victim's badly burned body was found on the stairway landing in a seated position. (Tr, II, 104-08.) She had an extension cord wrapped around the back of the her neck, cris-crossed over her chest, and then wrapped around her ankles. (Tr. IV, 104-105; Tr. V, 84.) Based upon the fire damage in the stairwell, the fire investigator opined that the victim was set on fire in the stairwell. He believed that flammable liquid was poured on the victim's lap and pooled in that area, causing severe burning in her abdominal area. (Tr. IV, 104, 121; Tr. V, 52.) The pathologist who performed the autopsy also opined that the severe charring in the victim's pelvic region was caused by the use of an accellerant and that the victim was in a seated position on a hard surface when the fire occurred. (Tr. V, 97.) The fire investigator could not identify the ignition source for the victim, but opined that it burned in the fire. (Tr. IV, 125.) The fire investigator excluded the furnace as an ignition source and thought it "highly unlikely" that the hot water heater ignited the accelerant poured on the victim because she was too far away from it. (Tr. IV, 125-26.) He also thought it unlikely that the victim was ignited in the basement and somehow made it to the stairway landing because of the lack of fire damage in the basement. (Tr. V, 9.) The pathologist also testified that it would have been difficult for the victim to run or walk because her ankles were bound. (Tr. V, 98.)

Even if the jury believed Petitioner's testimony that he did not intentionally set the victim on fire, he admitted that he spilled gasoline on the victim. Petitioner admittedly threatened to pour it on the victim's dog and set it on fire. (Int. Tr. II, 6, 9, 14-16, 30-31, 33.) Petitioner,

therefore, was well aware that gasoline is highly flammable and that the natural tendency of its use could cause death or great bodily harm.  Accordingly, the decision of the Michigan Court of Appeals was not an unreasonable application of *Jackson*.

III.   Prosecutorial Misconduct

Petitioner contends that the prosecutor's injection of Officer Powe's religious beliefs denied his due process right to a fair trial.  For example, when asked by the prosecutor what kind of relationship he had built with Petitioner during his incarceration at the Caldwell Parish jail, Powe described an honest and trusting relationship and stated that he "witnessed" to Petitioner.  Powe then added, "I feel strongly about God, Jesus, and my belief, and I believe he's the only one that can help us, the true things, and I still believe that."  (Tr. IV, 16.)  Powe also testified that he gave Petitioner a bible on March 30, 2000, and told Petitioner, "you got to do a lot of soul searching.  You need to read this book a little bit tonight and make your mind up what to do."  (Tr. IV, 21-22.)  Powe testified that the following morning he told Petitioner to tell the truth and to "[m]ake peace with God."  (Tr. IV, 25.)  Petitioner contends that the prosecutor improperly injected Officer's Powe's strong religious beliefs for the purpose of enhancing Powe's credibility.

In rejecting Petitioner's claim on appeal, the Michigan Court of Appeals stated:

> Lastly, defendant argues that the prosecutor committed misconduct by improperly eliciting evidence of a police officer's religious beliefs. Defendant did not preserve this issue with an appropriate objection to the challenged testimony at trial. See *People v Grant*, 445 Mich 535, 553; 520 NW2d 123 (1994). Accordingly, defendant must show a plain error that affected his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Claims of prosecutorial misconduct are reviewed with a case by case basis to determine whether the defendant was deprived of a fair trial. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995); *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999).

MRE 610 provides:

> Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced.

> Similarly, a prosecutor may not appeal to the sympathies and emotions of the jurors, *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001), or inject issues that are broader than the defendant's guilt or innocence, *People v Rice (On Remand)*, 235 Mich App 429, 438; 597 NW2d 843 (1999).

> In this case, Officer Powe's testimony about his discussion of religion with defendant was not offered for the purpose of bolstering his credibility as a witness. Rather, it was offered for the purpose of explaining the circumstances surrounding defendant's confession, which is a relevant consideration at trial. See *People v Snider*, 239 Mich App 393, 419; 608 NW2d 502 (2000). Defendant's claim of error is without merit.

(MCOA Op. 3-4.)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim

will result in a fundamental miscarriage of justice.  *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006)*;*

*Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice

exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual

innocence based upon new reliable evidence.  *House*, 126 S. Ct. 2077.

        The Michigan Court of Appeals expressly relied on Michigan's contemporaneous

objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was

well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271

(1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a

governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385.  Petitioner's failure to comply

with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous

objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72,

86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  Further,

even though the court of appeals applied a limited review of the claimed error to determine whether

it affected the outcome, Petitioner's failure to object is still considered a procedural default.  *See*

*Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th

Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003) (citing

*White v. Schotten*, 201 F.3d 743 (6th Cir. 2000) and *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000));

*Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989).

        Because petitioner procedurally defaulted his claim in the state courts, this Court will

only entertain the defaulted issue if he can show "cause" for the procedural default and "actual

prejudice" as result of the alleged federal violation or can show actual innocence.  *See House*, 126

S. Ct. at 2076 *; Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.  To show cause sufficient to

excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see also McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Petitioner has not attempted to explain his failure to make a timely objection to the prosecutor's alleged misconduct. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).[5] Petitioner also fails to present new reliable evidence that he is actually innocent. *See House*, 126 S. Ct. at 2077. Accordingly, the Court is barred from reviewing Petitioner's claim.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: January 19, 2007                    /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).

---

[5] In any event, Petitioner cannot establish prejudice. Petitioner argues that Officer Powe's credibility was important, as Powe testified that Petitioner said something to Powe about smelling gasoline. However, Petitioner's alleged statement to Powe about smelling gasoline was a minor admission in comparison to Petitioner's statements to police on March 31, in which he admitted to handling a gas can in the Bardins' basement, threatening to pour gas on the victim's dog, spilling gasoline on the victim and being present when she ignited. Taking the evidence as a whole, Powe's testimony regarding his religious belief did not affect the outcome of Petitioner's trial.